Argued October 21, decided November 15, 1909.

**PAUL v. PAUL.**

[104 Pac. 885.]

DEEDS—VALIDITY—UNDUE INFLUENCE—EVIDENCE.

Evidence *held* to show that an agreement between a father and son for support of the father, embracing a deed from the father to the son, was largely, if not wholly, at the father's own suggestion, and that no persuasion or undue influence was used by the son to induce him to execute it.

From Linn: WILLIAM GALLOWAY, Judge.

Statement by MR. JUSTICE MCBRIDE.

This is a suit brought by G. M. Paul, and others, against W. S. Paul and Lillie D. Paul, his wife, to set

aside certain conveyances made by W. A. Paul, now deceased, to defendant, W. S. Paul, and to cancel a certain agreement made between said deceased during his lifetime and W. S. Paul. Plaintiffs are legal heirs of W. A. Paul, and defendant, W. S. Paul, is also a son of W. A. Paul.

The complaint charges substantially that in the year 1902, W. A. Paul was the owner of a farm in Linn County, consisting of 448 acres of land; that at that time he was about 77 years old, feeble in mind and body and in his dotage, and incapacitated in mind and body to transact any kind of business or understand its nature; that one Cassie A. Burss, a shrewd, designing, and unprincipled woman, began to visit W. A. Paul and invite him to her house, and by humoring, petting, and caressing him, and by many other feminine wiles, gained complete control over him, and by persuasion and undue influence induced him to convey to her a portion of his farm containing about 200 acres; that such conveyance was made on the 16th day of July, 1902, and was entirely without consideration, and on the 12th day of September, 1902, it was duly recorded in the deed records of Linn County; that soon after the execution of the deed, defendant W. S. Paul acquired knowledge of its execution and delivery, and, in order to obtain the title to the whole of the land first above described, falsely. and fraudulently represented to W. A. Paul that it was necessary, in order to defeat Cassie A. Burss in her attempt to defraud W. A. Paul of the premises conveyed to her by him, that W. A. Paul should convey the whole farm to him; that thereafter, on the 11th day of September, 1902, W. S. Paul, by means of false and fraudulent representations and other undue influence, overpersuasion, and intimidation, induced W. A. Paul to convey the farm to him; that the farm was of the value of $13,465.40; that the deed purported to be made on a consideration of $8,977.50, but

that no consideration was paid for the premises, and the deed was without consideration and void; that the deed was recorded September 11, 1902; that the day following defendant caused to be recorded a mortgage on the premises for the sum of $7,000 in favor of W. A. Paul; that the mortgage was without consideration, and was executed by defendant as a part of his scheme to gain the title to the premises without paying any consideration therefor; that thereafter, and prior to April 16, 1903, Mrs. Burss, learning of the deed to W. S. Paul and fearing that she would be defeated in her desire to acquire the lands described in the deed from W. A. Paul to her, again sought his society, and by wheedling him with soft words and flattery soon gained complete control over him, and induced him to borrow from Ladd & Bush and C. P. Bishop $4,000, and give it to her, which he did, without any consideration; that on April 16, 1903, W. S. Paul, by means of undue influence and misrepresentation, caused W. A. Paul to execute to him a quitclaim deed to the land he had theretofore conveyed to Mrs. Burss; that the deed was without consideration, and that at the date of its execution, W. A. Paul was mentally unsound and incapacitated to transact any business, and did not understand the nature of the transaction or the effect of the deed; that on the same date defendant induced W. A. Paul to cancel the $7,000 mortgage; that on the 17th day of April defendant fraudulently induced W. A. Paul to enter into an agreement which is set up in the complaint, and the substance of which is as follows:   Defendant agreed to give W. A. Paul a lease for life on ten acres of land, hereinbefore described, to be selected by him from the lands theretofore conveyed by him to W. S. Paul, and, in the event that the selection should be made of lands other than where the residence stood, defendant was to erect for W. A. Paul, at his own expense, a suitable residence on

the land so selected, and, in case W. A. Paul should marry again, his widow should continue to hold such selected land during her natural life. The agreement further provided that defendant should furnish W. A. Paul during his natural life with all the flour, meat, and clothing and such other expenses as should be necessary for his maintenance, and such reasonable expenses as should be necessary in visiting his relatives in Oregon or California, W. A. Paul agreeing not to make demand for traveling expenses at any unreasonable time, when interest and taxes should become due, or at a time when any heavy expense for the operation of the place should be payable.

The answer of defendants admits that in July, 1902, W. A. Paul was the owner of the land described in the complaint; that W. S. Paul is the son of W. A. Paul, deceased, and denies generally the other allegations of the complaint.

A further and separate answer alleges that in July, 1902, W. A. Paul was the owner of the farm described in the complaint; that he was at that date a widower and contemplated marriage with Cassie A. Burss, who caused him to believe that she was a widow and able to contract a legal marriage; and, believing that he and Mrs. Burss would intermarry, he agreed to convey to her the 200 acres described in the complaint, with the understanding that she would become his wife, and that the property should be in lieu of any interest she might have in his property or lands in the event of his death, but as a matter of fact only 120 acres of the land so conveyed was included in the farm of W. A. Paul, the remaining 80 acres having been sold previously by him to one Henry Kinzer; that thereafter it was ascertained that Mrs. Burss was a married woman; that soon after she received the deed she removed from Linn County to Salem or Portland, and so treated W. A. Paul that he

became convinced she did not intend to carry out her contract of marriage, but intended to secure his property and desert him; that thereafter W. A. Paul, upon his own suggestion, proposed to sell the whole of his lands to defendant, W. S. Paul, for $8,977.60, provided that he would take the lands subject to the deed to Mrs. Burss, and defend any litigation that there might be in reference to the same, and also to clear the title of Henry Kinzer to the 80 acres which had been accidentally included in the deed to Mrs. Burss; that W. S. Paul accepted such proposal and executed and delivered to W. A. Paul four promissory notes, all dated September 12, 1902—one for $1,977.60, due one year after date, one for $2,000, due two years after date, one for $3,000, due three years after date, and one for $2,000, due four years after date, all bearing interest at six per cent per annum, and all except the first being secured by a mortgage upon all the lands conveyed to him by W. A. Paul; that thereafter, on April 13, 1903, W. A. Paul borrowed $4,000 of Ladd & Bush and C. P. Bishop, of Salem, and that on the 15th day of April, to secure the note for $4,000, he assigned them the notes and mortgage heretofore executed in his favor by defendants; that on the 17th day of April defendant W. S. Paul entered into an agreement with Ladd & Bush and Bishop, whereby it was agreed that defendant should take the $4,000 note of W. A. Paul and execute his own note for a like amount, to be secured by a mortgage on the lands first described in the complaint; that on the same date defendant entered into the agreement with W. A. Paul, which is set forth in the complaint, and alleges that he complied with the agreement; that at all the times mentioned in the complaint and answer, W. A. Paul was in his right mind, and thoroughly understood his business and what he wanted to do and how to do it, and no advantage was taken of him by defendants in any man-

ner whatever; that on the 11th day of September, 1902, it was agreed between defendant and W. A. Paul that defendant should take all the personal property upon the said farm and sell it and pay the indebtedness of W. A. Paul to certain persons in and about Linn County, and pay the remainder to W. A. Paul, and alleges a complete settlement of this transaction. To this there was a reply traversing the new matter.     REVERSED.

For appellant there was a brief over the names of *Messrs. Weatherford & Wyatt* and *Mr. Myron E. Pogue,* with oral arguments by *Mr. James K. Weatherford* and *Mr. Pogue.*

For respondent there was a brief over the names of *Messrs. Hewitt & Sox* and *Mr. C. C. Bryant,* with oral arguments by *Mr. Henry H. Hewitt* and *Mr. Bryant.*

MR. JUSTICE MCBRIDE delivered the opinion of the court.

From the foregoing statement it will be seen that the main question to be solved is that relating to the capacity of W. A. Paul to enter into the contracts and make the agreement whereby the apparent legal title to the land in controversy passed to W. S. Paul. It appears from the testimony that in 1902, W. A. Paul was a widower, about 77 or 78 years old, and that he became infatuated with one Mrs. Burss. It seems probable from the testimony that she was a married woman, and it also appears very probable that W. A. Paul, supposing her to be single, contemplated marriage with her. W. S. Paul's testimony is to the effect that his father told him it was the understanding that he and Mrs. Burss were to be married, and that, when they were about to complete the arrangements, she suggested to him that the children might object, and that she thought it would be better if he gave her a deed to the land to avoid any trouble, and that he gave her the deed to make her know she was all right in depending upon him. It is very evident

from the testimony that the old gentleman was averse to having the matter of his relations with Mrs. Burss made public, and that, whether their relations were chaste or meretricious, he was heartily ashamed of them. The evidence as to his mental condition is very conflicting, and it is doubtful whether upon the testimony adduced for plaintiffs, there is sufficient to justify a court in finding that he was incapable of making the contracts and conveyances which are the subject-matter of this suit. Some of plaintiffs' witnesses, while testifying to considerable physical impairment and decay, held to the belief that mentally he was fairly capable for a man of his age, others testifying to various stages of mental decay, ranging from slight impairment of faculties to absolute childishness; and it is very evident that the opinion of many of them is based in a large degree upon his conduct in respect to Mrs. Burss, which, though very foolish and unbusinesslike, is not uncommon even among younger men when placed in the same circumstances.

There is no legal evidence that his son used any influence or persuasion to induce his father to make the conveyances and take the notes and mortgage described in the pleadings. While it is suggested that the price paid was inadequate, we do not think the evidence shows such inadequacy as would avoid the contract. The title to 120 acres of land was clouded by a deed to Mrs. Burss, and the son also bound himself to clear the title to the land previously deeded to Kinzer. He was to all appearances buying two lawsuits, with a possibility of losing 120 acres of the land conveyed, and this was doubtless considered by the father in fixing the price. That the father was apprehensive of further difficulty with Mrs. Burss is probably true, but there is no evidence that the son worked on these fears, or strove to make them a pretext for making a close bargain or securing the title in his own name. But we think the testimony

adduced by defendant fairly establishes the fact that
W. A. Paul was fully competent to convey this property,
and to realize and understand what he was doing. This
testimony comes from his friends, neighbors, and near
relatives, and from physicians and business men who
were thoroughly acquainted with him, some for more
than half a century, and in our judgment far outweighs
the case made by plaintiffs.

W. A. Paul's subsequent act in paying Mrs. Burss
$4,000 can be explained on a different theory than that
advanced by plaintiffs. The testimony shows that he
had long been esteemed as one of the substantial citizens
of Linn County, and that he felt extremely humiliated
and ashamed that his relations with Mrs. Burss should
be a subject of general knowledge in the community.
To avoid this and prevent injury to his reputation, he
probably concluded that the better way would be to buy
the woman off and take a deed back to the land he had
conveyed to her, and acting upon that impulse, he bor-
rowed the $4,000 from Ladd & Bush and Bishop, and
used it for that purpose. To procure the loan he made
a representation that he was the owner of a mortgage and
promissory notes to the amount of his son's indebtedness
to him, and also of the land in controversy. As the note
had two years to run, he doubtless thought he would be
able to collect sufficient money from his son to meet it, and
that the real facts would never come to the knowledge of
his Salem creditors. When, however, they discovered
that he had misrepresented the facts in regard to the
ownership of the land and taxed him with the deception,
he made the best arrangement that occurred to him to
satisfy them. The testimony shows that, when Bishop
reproached him for deceiving him in regard to his prop-
erty, he replied "Charley, are you going to put me in
the penitentiary?" thus indicating that he fully realized
the nature and even the legal consequences of what he

had done. It is a significant fact that nowhere in his conversation with Bishop did he set up any claim to any right or interest in the farm itself or attempt to excuse· his previous representations by claiming that he had any interest or equity in it. Under these circumstances, the son was sent for and the agreement for support was entered into. We think the evidence shows that the agreement was largely, if not wholly, of the father's own suggestion, and that no persuasion or undue influence was used by the son to induce him to execute it. We think it is shown by a fair preponderance of the evidence that the defendant has substantially performed his part of the agreement, and that the court below erred in holding that the same was procured by any undue influence or fraudulent action.

The decree of the court below will be reversed, and a decree entered for defendants. REVERSED.